We therefore AFFIRM the decision of the district court.

Craig J. LaCROSSE, Petitioner,

v.

**COMMODITY FUTURES TRADING COMMISSION, Respondent.**

No. 97–1239.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 18, 1997.

Decided Feb. 24, 1998.

Matthias A, Lydon (argued), Thomas C. Cronin, Winston & Strawn, Chicago, IL, for Petitioner.

Pat G. Nicolette, Robert S. Zwirb (argued), Commodity Futures Trading Commission, Office of the General Counsel, Washington, DC, Dennis M. Robb, Commodity Futures Trading Commission, Chicago, IL, for Respondent.

Before CUMMINGS, EASTERBROOK and KANNE, Circuit Judges.

KANNE, Circuit Judge.

Craig J. LaCrosse petitions for review of a final order of the Commodity Futures Trading Commission ("Commission") entered in January 1997, which bars him from trading in any market regulated by the Commission for five years. Because this administrative sanction followed a criminal sentence for the same conduct, LaCrosse claims the Commission's order violates the Double Jeopardy Clause of the Fifth Amendment. LaCrosse also challenges the imposition of the trading ban on the ground that the Commission abused its discretion by failing to follow precedent, by failing to consider evidence relevant to mitigation and rehabilitation, and by imposing a requirement that he serve half his trading ban prior to petitioning the Commission for a reduction for good cause. Finally, LaCrosse appeals to equity and asks us to use our discretion to limit the Commission's power to impose sanctions upon him.

Following the recent Supreme Court decision in *Hudson v. United States*, — U.S. —, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997), we conclude that the administrative sanction is not a criminal punishment, and therefore the Double Jeopardy Clause does not prohibit its imposition following criminal sentencing for the same conduct. Because we also find that the Commission did not abuse its discretion and we decline to limit the Commission's power to sanction in this case, we affirm the Commission's order.

## I. HISTORY

In August 1989, Craig J. LaCrosse pleaded guilty to one felony violation of § 4b of the Commodity Exchange Act ("the Act"),[1] 7 U.S.C. § 6b, and one misdemeanor violation of § 4c(a)(A) of the Act, 7 U.S.C. § 6c(a)(A). In June 1991, the United States District Court for the Northern District of Illinois sentenced LaCrosse to three years probation and over $9,000 in restitution and fines.

In January 1990, the Chicago Board of Trade ("CBOT") commenced a formal disciplinary proceeding against LaCrosse for violations of its rules prohibiting noncompetitive trading, fraudulent conduct, and acts detrimental to the interest and welfare of the exchange. The CBOT suspended LaCrosse from trading for seventeen months.

In August 1990, the Commission issued a three-count administrative complaint against LaCrosse. The complaint sought revocation of LaCrosse's floor broker registration, a cease and desist order, a trading prohibition, and a civil monetary penalty. LaCrosse admitted all material facts in the complaint, and the Administrative Law Judge ("ALJ")

---

1. Prior to 1926, the positive federal law was contained in a volume entitled *Revised Statutes of 1875* and then in subsequent volumes of the *United States Statutes at Large*. See Jacobstein et al., *Fundamentals of Legal Research* 165 (6th ed.1994). The *United States Code* ("U.S.C.") was published in 1926, and included all of the public and general laws still in force. See id. Unlike the *Revised Statutes of 1875*, however, Congress never enacted the U.S.C. in its entirety. See id. Instead, the Office of the Revision Counsel submits the U.S.C. to Congress title by title for enactment into law. See id. Currently, less than half of the titles have been enacted by Congress. See id.

Congress has not yet enacted Title VII of the U.S.C. See id. This title is therefore *prima facie* evidence of the law, but if a conflict arises between the wording in the U.S.C. and the *Statutes at Large*, the latter governs. See id. Possibly in recognition of this fact, the Commission's custom is to refer to particular sections of the Commodity Exchange Act by their original section numbers, and not by the U.S.C. designation. This opinion, in accordance with Commission custom, will also use the original section numbers in citing the Act. Each time a new section is introduced, however, the corresponding U.S.C. reference will be included. To complicate matters further, the Act was amended in 1992 by the Futures Trading Practices Act of 1992. All conduct relevant to this appeal occurred prior to this amendment. Thus this opinion will refer to the Act as it existed prior to the 1992 amendments.

granted summary disposition as to La-Crosse's liability. The ALJ ordered the parties to brief the issue of sanctions.

The Commission filed a second complaint in August 1991, after LaCrosse's sentencing in the criminal proceeding. It alleged that LaCrosse, by virtue of his criminal conviction, was statutorily disqualified from registration under § 8a(2)(D) and (E) of the Act, 7 U.S.C. § 12a(2)(D) and (E). LaCrosse admitted that he was subject to the statutory disqualification. The ALJ suspended La-Crosse's floor broker registration for six months and ordered him to show cause why his registration should not be revoked.

The two administrative proceedings were consolidated, and the ALJ conducted a hearing on sanctions in December 1991. In June 1992, the ALJ issued his initial decision ordering LaCrosse to cease and desist from further violations of the Act, revoking his registration, and prohibiting him from trading for five years. Both sides appealed to the Commission regarding the length of the trading ban.

The Commission found that under § 9(b) of the Act, 7 U.S.C. § 13(b), LaCrosse's conviction raised a presumption that he was unfit for registration and should be banned from trading for five years. See In re La-Crosse, [1992–1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) para. 25,840, Nos. 90–20 and SD 91–6, 1993 WL 316017, at *4 (C.F.T.C. Aug. 13, 1993) [hereinafter La-Crosse I]. However, because the Commission had not previously interpreted or applied § 9(b), the Commission noted that neither the ALJ nor the parties had notice of the evidentiary burdens required by that section. See id. at *5. Therefore the Commission remanded the case to the ALJ so the parties could supplement the record in accordance with its guidance on the proper application of § 9(b). See id.

Following a second hearing in May 1994, the ALJ issued a second order. Finding that LaCrosse had rebutted the presumption that he should be banned from all regulated markets for five years, the ALJ imposed a trading ban of three years. Both parties again appealed to the Commission.

In January 1997, the Commission issued its final order. See In re LaCrosse, [Current Transfer Binder] Comm. Fut. L. Rep. (CCH) para. 26,944, Nos. 90–20 and SD 91–6, 1997 WL 20731, at *10 (C.F.T.C. Jan. 21, 1997) [hereinafter LaCrosse II]. The Commission found that LaCrosse's conduct was "both intentional and grave." See id. at *8. It dismissed LaCrosse's claim that he did not act knowingly, citing the fact that he pleaded guilty to a crime that required scienter and that CBOT Rule 350.04 gave "clear notice" that his acts were inappropriate. See id. at *7. The Commission also rejected LaCrosse's contention that his actions were mitigated by the fact that others at the exchange participated in the same behavior and that there was general "confusion" over how to resolve out trades. See id. at *8. In addition to the lack of mitigating evidence, the Commission found that LaCrosse's pattern of noncompetitive trades constituted aggravating evidence. See id.

On the issue of rehabilitation, the Commission found that LaCrosse had taken only "limited first steps on the path" which did not establish the kind of significant change "that would warrant an inference that he poses no substantial risk to market integrity." Id. at *9. The Commission questioned LaCrosse's understanding of the nature and gravity of his offense, noting that LaCrosse continued to assert that the rule he broke was illogical and that his actions did not affect the markets. See id. The Commission also gave limited weight to LaCrosse's character witnesses since none of them were experts on the issue of rehabilitation. See id. While the Commission noted that LaCrosse's subsequent trading without incident "adds credence" to his rehabilitation claim, it gave such evidence limited weight because La-Crosse was subject to an outstanding administrative proceeding during that time. See id. at *10. Finally, the Commission noted that LaCrosse intended to return to the floor as a trader, so he would be in a position "to repeat the very wrongdoing at issue in this case." See id. Based on this analysis, the Commission determined that LaCrosse had not overcome the presumption that he should be barred from the markets regulated by the Commission for a period of five years. The

Commission's order therefore imposed a five-year trading ban, as well as making final the cease and desist order and registration revocation from the first ALJ decision. *See id.* LaCrosse appeals to this Court.

## II. Analysis

██ We will disturb factual determinations made by the Commission only if they are not supported by the weight of the evidence. *See Monieson v. CFTC,* 996 F.2d 852, 858 (7th Cir.1993); *Gimbel v. CFTC,* 872 F.2d 196, 199 (7th Cir.1989). "Review of legal questions, or of the application of law to facts, depends on the nature of the question and the comparative qualifications and competence of the decisionmakers." *Monieson,* 996 F.2d at 858; *see also Morris v. CFTC,* 980 F.2d 1289, 1292 (9th Cir.1992). We apply a deferential standard to questions of law encompassed by the agency's expertise, so long as the agency's conclusion is a reasonable one. *See Monieson,* 996 F.2d at 858. "When the question is of the sort that courts commonly encounter, *de novo* review is proper." *Id.* With regard to the agency's imposition of sanctions, the choice of sanction "[is] not to be overturned unless the Court of Appeals might find it 'unwarranted in law or ... without justification in fact....'" *Butz v. Glover Livestock Comm'n Co.,* 411 U.S. 182, 185–86, 93 S.Ct. 1455, 1458, 36 L.Ed.2d 142 (1973) (quoting *American Power Co. v. SEC,* 329 U.S. 90, 112–13, 67 S.Ct. 133, 145–46, 91 L.Ed. 103 (1946)). If the agency's sanction falls within the statutory limits, it "must be upheld unless it reflects an abuse of discretion." *Flaxman v. CFTC,* 697 F.2d 782, 789 (7th Cir.1983); *see also Monieson,* 996 F.2d at 858.

### A. Double Jeopardy Analysis

██ We review *de novo* whether the Double Jeopardy Clause bars the Commission from imposing an administrative sanction after criminal sentencing for the same conduct. *See Monieson,* 996 F.2d at 858. The Double Jeopardy Clause provides, "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. The Supreme Court has long recognized that the guarantee against double jeopardy "protects against multiple punishments for the same offense." *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076–77, 23 L.Ed.2d 656 (1969); *see also Helvering v. Mitchell,* 303 U.S. 391, 399, 58 S.Ct. 630, 633, 82 L.Ed. 917 (1938) ("[T]he double jeopardy clause prohibits merely punishing twice, or attempting a second time to punish criminally, for the same offense."). The parties have not contested the elements of double jeopardy other than the second punishment issue; the sole question before us, then, is whether the trading ban imposed by the Commission constitutes the kind of second punishment forbidden by the Double Jeopardy Clause.

The recent Supreme Court decision in *Hudson v. United States* guides our inquiry. *Hudson,* —— U.S. ——, 118 S.Ct. 488. In *Hudson,* the Office of the Comptroller of the Currency ("OCC") imposed monetary penalties and occupational debarment on the petitioners for violating 12 U.S.C. §§ 84(a)(1) and 375b. *See id.* at ——, 118 S.Ct. at 491. The Government later criminally indicted the petitioners for the same conduct, and they moved to dismiss on the ground that the criminal indictment violated the Double Jeopardy Clause of the Fifth Amendment.[2] *See*

---

2. *Hudson* involved a criminal proceeding following an administrative sanction, while the case before us involves an administrative sanction following a criminal prosecution. This distinction does not affect our analysis. While disavowing the test articulated in *United States v. Halper,* 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989), for determining whether a penalty implicates the Double Jeopardy Clause, *Hudson* reaffirms the notion in *Halper* that a civil penalty can sometimes constitute "punishment" so as to trigger the Clause. *See Hudson,* —— U.S. at —— ——, 118 S.Ct. at 492–94. Thus whether the civil penalty precedes or follows the criminal

punishment is of no moment to the analysis; the question remains whether the petitioner is subject to "multiple criminal punishments for the same offense." *Id.* at ——, 118 S.Ct. at 493. *Accord United States v. Kayne,* 90 F.3d 7, 10 (1st Cir.1996) (finding that the "Double Jeopardy Clause protects against 'multiple punishments for the same offense,' even if one of the proceedings is civil and one criminal, regardless of the sequence") (quoting and citing *Halper,* 490 U.S. at 439, 109 S.Ct. at 1896–97); *United States v. Sanchez-Escareno,* 950 F.2d 193, 200 (5th Cir. 1991) ("[T]he *Halper* principle that a civil penalty can be factored into the double jeopardy matrix

*id.* at ———–———, 118 S.Ct. at 492–93. The Supreme Court held that the Double Jeopardy Clause did not bar the later criminal prosecution because the administrative proceedings were civil and not criminal. *See id.* at ———–———, 118 S.Ct. at 496–97. In so holding, the Court "disavow[ed] the method of analysis used in *United States v. Halper*, 490 U.S. 435, 448, 109 S.Ct. 1892, 1901–1902, 104 L.Ed.2d 487 (1989), and reaffirm[ed] the previously established rule exemplified in *United States v. Ward*, 448 U.S. 242, 248–249, 100 S.Ct. 2636, 2641–2642, 65 L.Ed.2d 742 (1980)." *Id.* at ———, 118 S.Ct. at 491.

■ The Court decided that the *Halper* framework, which required courts to determine "whether a particular sanction is 'punitive,' and thus subject to the strictures of the Double Jeopardy Clause, has proved unworkable." *Id.* at ———, 118 S.Ct. at 494. Noting that the Double Jeopardy Clause "protects only against multiple *criminal* punishments for the same offense," *id.* at ———, 118 S.Ct. at 493 (emphasis added), the Court established a test that focuses on whether the sanction at issue may properly be deemed "criminal." *See id.* at ———–———, 118 S.Ct. at 492–94. If a sanction is "criminal" in the relevant sense, it triggers the Double Jeopardy Clause's protections regardless of whether the sanction is "punitive" or "remedial."

■ "Whether a particular punishment is criminal or civil is, at least initially, a matter of statutory construction." *Id.* at ———, 118 S.Ct. at 493. Thus the first step in our analysis is to determine whether the legislature " 'in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other.' " *Id.* (quoting *Ward*, 448 U.S. at 248, 100 S.Ct. at 2641). The inquiry does not end there, however. Even if the legislature intended to create a civil penalty, the penalty may still be "criminal" for purposes of double jeopardy analysis. The second step of the analysis requires us to determine " 'whether the statutory scheme was so punitive either in purpose or effect,' " *id.* (quoting *Ward*, 448 U.S. at 248–49, 100 S.Ct. at 2641–42), to convert

the intended civil penalty into a criminal one. To answer this latter question, the Court directs our attention to the factors established in *Kennedy v. Mendoza–Martinez*, 372 U.S. 144, 168–69, 83 S.Ct. 554, 567–68, 9 L.Ed.2d 644 (1963). Those seven factors are as follows:

> [w]hether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as punishment, whether it comes into play only on a finding of *scienter*, whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned.

*Id.* at 168–69, 83 S.Ct. at 567–68 (footnotes omitted). The *Hudson* Court reminds us that these factors should be applied to the statute on its face, and " 'only the clearest proof' will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Hudson*, ——— U.S. at ———, 118 S.Ct. at 493 (quoting *Ward*, 448 U.S. at 249, 100 S.Ct. at 2641–42).

■ With this framework in mind, we proceed to the merits of LaCrosse's claim. The Commission imposed a five-year trading ban on LaCrosse pursuant to § 9(b) of the Commodity Exchange Act. Section 9(b) provides:

> A person convicted of a felony under this subsection shall be . . . barred from using or participating in any manner in any market regulated by the Commission for five years or such longer period as the Commission shall determine on such terms and conditions as the Commission may prescribe, unless the Commission determines that the imposition of such . . . market bar is not required to protect the public interest.

Although this provision does not contain language expressly deeming it a "civil" sanction,

should apply whether the civil penalty precedes or follows the criminal proceeding."); *United States v. Reed*, 937 F.2d 575, 577 n. 3 (11th

Cir.1991) (finding under *Halper* that the sequential order of proceedings is irrelevant to the analysis).

the fact that the Commission has the authority to issue the trading ban and prescribe the terms and conditions of the ban is significant. "That such authority was conferred upon [an] administrative agenc[y] is prima facie evidence that Congress intended to provide for a civil sanction." *Hudson,* —— U.S. at ——, 118 S.Ct. at 495. There is no evidence that suggests Congress intended otherwise. Therefore we find that the legislature "indicated an intention to establish a civil penalty." *Ward,* 448 U.S. at 248–49, 100 S.Ct. at 2641.

Turning to the second stage of analysis, we must determine whether, notwithstanding this legislative preference, the sanction operates in such a way as to transform it into a criminal penalty. Our analysis will parallel that in *Hudson* because the sanctions in the two cases are nearly identical.[3] With regard to the first *Kennedy* factor, the *Hudson* court found that an occupational debarment did not constitute an " 'affirmative disability or restraint,' as that term is normally understood." *Hudson,* —— U.S. at ——, 118 S.Ct. at 496. The Court reasoned, "[w]hile petitioners have been prohibited from further participating in the banking industry, this is 'certainly nothing approaching the "infamous punishment" of imprisonment.' " *Id.* (quoting *Flemming v. Nestor,* 363 U.S. 603, 617, 80 S.Ct. 1367, 1376, 4 L.Ed.2d 1435 (1960)). If a lifelong bar from an industry does not constitute an "affirmative disability or restraint," then a five-year trading ban certainly does not deserve this characterization.

Our analysis of the second *Kennedy* factor, whether the sanction has been historically viewed as punishment, also follows *Hudson.* In *Hudson,* the Court stated, "neither money penalties nor debarment have historically been viewed as punishment. We have long recognized that 'revocation of a privilege voluntarily granted,' such as a debarment, 'is characteristically free of the punitive criminal element.' " *Id.* (quoting *Helvering,* 303 U.S. at 399–400 & n. 2, 58 S.Ct. at 633 & n. 2). LaCrosse's ability to trade on the markets regulated by the Commission is "a privilege voluntarily granted," and therefore the revo-

cation of such privilege for five years is not a sanction historically viewed as punishment. *Accord United States v. Furlett,* 974 F.2d 839, 844 (7th Cir.1992) (finding that permanent trading ban was remedial measure intended to ensure integrity of markets).

The third *Kennedy* factor asks "whether [the sanction] comes into play only on a finding of *scienter.*" At the time this case was commenced, § 9(b) of the Act provided that it was a felony to knowingly violate several specific provisions of the Act. *See LaCrosse I,* 1993 WL 316017, at *3. For any person who committed a felony under the section, § 9(b) also authorized the imposition of certain sanctions, such as the trading ban at issue in this case. In other words, for the sanctions to come into play, a person must have been convicted of knowingly violating one (or more) of the enumerated provisions of the Act. Thus, the sanction comes into play only on a finding of *scienter.* While the first two *Kennedy* factors suggest that the sanction retains its civil character, this factor points in the opposite direction.

The fourth factor asks whether the operation of the sanction will promote the traditional aims of punishment, i.e. retribution and deterrence. While it is certainly true that imposing a trading ban will likely deter the transgressor and others from future illegal conduct, "the mere presence of this purpose is insufficient to render a sanction criminal, as deterrence 'may serve civil as well as criminal goals.' " *Hudson,* —— U.S. at ——, 118 S.Ct. at 496, 139 L.Ed.2d 450 (quoting *United States v. Ursery,* 518 U.S. 267, ——, 116 S.Ct. 2135, 2149, 135 L.Ed.2d 549 (1996)). The sanctions at issue here, while serving the goal of deterrence, were intended to ensure the integrity of the markets regulated by the Commission. The language of the statute itself supports this conclusion; the Commission has the power to impose a lighter sanction, or none at all, if the Commission finds that the imposition of a sanction "is not required to protect the public interest." 7 U.S.C. § 13(b). The Act's legislative history

---

**3.** We examine a trading ban that prohibits La-Crosse from trading on markets regulated by the Commission for a period of five years, while the *Hudson* Court looked at occupational debarment, prohibiting petitioners from further participating in the banking industry.·

also suggests that these sanctions were intended to ensure market integrity and enhance public confidence. The House Report states:

> The Committee has included additional provisions in H.R. 5447 to protect the public from persons who have a record of felonious conduct in the commodities business.... These penalty provisions coupled with the more stringent registration provisions should give the investing public greater confidence in the integrity of persons with whom they deal who represent different segments of the commodity industry.

H.R.Rep. No. 97–565, at 54 (1982), *reprinted in* 1982 U.S.C.C.A.N. 3871, 3903. Thus, while the sanctions may have the effect of deterring violations of the Act, they were not created to "promote the traditional aims of punishment."

We next examine whether the behavior to which the sanction applies is already a crime. Since the imposition of the sanction is dependent on a felony conviction, the targeted behavior is already criminal. However, "[t]his fact is insufficient to render the ... debarment sanctions criminally punitive ... particularly in the double jeopardy context, *see United States v. Dixon,* 509 U.S. 688, 704, 113 S.Ct. 2849, 2860, 125 L.Ed.2d 556 (1993) (rejecting 'same-conduct' test for double jeopardy purposes)." *Hudson,* —— U.S. at ——, 118 S.Ct. at 496–97 (citation omitted).

We consider the final two *Kennedy* factors together: whether there is an alternative purpose for the sanction and whether the sanction appears excessive in relation to the alternative purpose assigned. We take "alternative purpose" to mean a purpose other than a punitive purpose; in this case the alternative purpose for the sanction is the actual intended purpose: to ensure integrity of the markets. The presumption of a five-year trading ban is not excessive in relation to this purpose. Indeed, the Commission has the authority to impose a lesser ban if the five-year ban is not required to protect the public interest. The gravity of the sanction is thus keyed to its intended purpose; the Commission will impose a ban commensurate with its need to protect the public interest.

This system, therefore, does not create an "excessive" sanction.

In sum, only two factors suggest the sanction at issue is a "criminal" one. The sanction comes into play only upon a finding of scienter, and the behavior to which the sanction applies is already a crime. Based on our analysis of all of the factors, this does not constitute the requisite clear proof required to "override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Id.* at ——, 118 S.Ct. at 493. We therefore hold that the trading ban imposed pursuant to § 9(b) of the Commodity Exchange Act is not "criminal" for the purposes of the Double Jeopardy Clause. The Double Jeopardy Clause does not bar the imposition of this sanction after criminal sentencing for the same conduct.

**B. LaCrosse's Claim that the Commission Abused its Discretion by Imposing a Five–Year Trading Ban**

■ LaCrosse makes several arguments claiming that the Commission abused its discretion in imposing a five-year trading ban. First, LaCrosse asserts that the Commission failed to follow the law it established for consideration of his case. He cites two examples: (1) that the Commission accorded limited weight to the fact that LaCrosse has been trading without incident for three years when the Commission previously stated that such evidence plays "an important role" in determining rehabilitation; and (2) that after directing LaCrosse to present evidence of mitigation, the Commission dismissed such evidence and even used it to support its conclusion that LaCrosse failed to understand the nature and significance of his conduct. We find that neither of these examples represents an abuse of the Commission's discretion.

With regard to the length of time LaCrosse has been trading without incident, the Commission's precedent makes clear that such evidence is instructive on the question of rehabilitation, but not dispositive. *See In re Bryant,* No. CRAA 88–3, 1990 WL 282904, at *9 (C.F.T.C. April 18, 1990) (noting that absence of wrongful conduct "may be a factor indicating rehabilitation"); *In re Akar,* No.

82–29, 1986 WL 66157, at *8 (C.F.T.C. Feb. 24, 1986) ("[T]hough not determinative, time is a 'relevant factor' in the Commission's consideration as to whether an applicant has been rehabilitated."). In fact, the first Commission decision in this matter reinforces this conclusion: "The absence of further wrongful conduct since the time of the original wrongdoing plays an important role in a respondent's showing [of rehabilitation].... Nevertheless, such a showing, standing alone, may not be sufficient to establish a respondent's rehabilitation." *LaCrosse I*, 1993 WL 316017, at *5. While recognizing that evidence of the absence of wrongful conduct can be instructive, the Commission clearly stated that such evidence is not determinative on the issue.

In *LaCrosse II*, the Commission explicitly acknowledged that LaCrosse's three years of trading without incident "adds credence to his claim that he has changed the direction of his conduct." *LaCrosse II*, 1997 WL 20731, at *10. The Commission went on to state, in accordance with Commission precedent, that "the weight accorded such evidence must be limited when respondent is subject to an outstanding administrative complaint during the period at issue." *Id.*; *see also In re Silverman*, No. 76–18, 1977 WL 13527, at *2 (C.F.T.C. March 14, 1977). The Commission stated the general rule in *LaCrosse I*—the absence of wrongful conduct since conviction is evidence of rehabilitation. The Commission then elaborated on this general rule in *LaCrosse II* by noting that the passage of time without incident has less probative value given that the administrative hearing hung over LaCrosse's head like the Sword of Damocles. We fail to find an abuse of discretion in the Commission's decision to accord less weight to LaCrosse's evidence in recognition of the incentives provided by an ongoing investigation. It was reasonable and in accordance with Commission precedent.

LaCrosse's second example is similarly unavailing. LaCrosse claims that in *LaCrosse I*, the Commission "instructed" him to present evidence of mitigation and then "cursorily dismissed" such evidence and even used it against him in *LaCrosse II*. The Commission, in *LaCrosse I*, provided guidance on the imposition of sanctions under § 9(b). *See LaCrosse I*, 1993 WL 316017, at *4–*5. It explained that § 9(b) established a presumption that a person convicted of a felony under that section would pose a threat to the public interest for a (minimum) period of five years. *See id.* at *4. The respondent may rebut this presumption with evidence that no trading ban is required to protect the public interest, or that a shorter trading ban is sufficient.[4] *See id.* In assessing the public interest, the Commission asks whether the respondent's participation in the markets poses a risk to their integrity. *See id.* The Commission first examines "the nexus between the wrongdoing underlying his conviction and a threat to the market mechanism." *Id.* Next, the Commission reviews mitigation evidence, or evidence that "tends to show that the weight that would ordinarily be accorded the presumption in favor of a five year prohibition should be lessened." *Id.* at *5. The Commission will also look at evidence of rehabilitation. *See id.* Finally the Commission will consider what role the respondent wishes to play in the market. *See id.*

Given this guidance, LaCrosse chose to present certain evidence regarding mitigation. In short, his evidence amounted to an assertion that "everyone else was doing it" as a result of confusion and misunderstanding of relevant statutes and Commission and CBOT rules. LaCrosse claims that the Commission "cursorily dismissed" this evidence. This is simply not the case. The Commission directly addressed LaCrosse's claim that "everyone else was doing it" somehow mitigated his illegal behavior, devoting a lengthy portion of its discussion to the matter. *See LaCrosse II*, 1997 WL 20731, at *8. The Commission concluded that Commission Rule 1.38 gave "clear notice" to all traders that non-competitive trades were unlawful, and therefore rejected the contention that such illegal trades become more palatable because others participated in the same behavior. *See id.* at *8.

---

4. The operation of these presumptions and their corresponding burdens are Commission interpretations of the relevant statutes. Since the parties have not challenged these interpretations, we apply these standards but do not vouch for their correctness.

LaCrosse's claim that the Commission abused its discretion by using the mitigation evidence against him is also unpersuasive. LaCrosse asserts that the Commission employed his "everyone else was doing it" defense to establish that he failed to understand the nature and significance of his conduct. However, the weight of the Commission's finding on this matter rests on the fact that LaCrosse continually asserted that his behavior did not affect the market and on the fact that LaCrosse persisted in arguing that the rule he broke was illogical. *See id.* at *9. We find no abuse of discretion in either the Commission's rejection of LaCrosse's mitigation evidence or in the evidence it used to support its conclusion that LaCrosse failed to show that he understands the full nature of his conduct.

LaCrosse's second claim is that the Commission abused its discretion by basing its decision on the absence of testimony from LaCrosse's probation officer. LaCrosse overstates the matter. The Commission noted that LaCrosse did not attempt to qualify any of his character witnesses as experts on the issue of rehabilitation. *See id.* It then cited for comparison *In re Walter*, a case in which a probation officer, "who worked closely with respondent for a significant period following his conviction, had the type of experience and expertise that buttressed the reliability of his opinion on the likelihood of future violations." *Id.* The operative point was not that a probation officer was involved, but instead that *Walter* presented a witness with the kind of experience that would "buttress[ ] the reliability of his opinion on the likelihood of future violations." Because LaCrosse failed to present any witnesses with these characteristics, the Commission accorded the testimony of his character witnesses "limited weight." [5]

The Commission also offered other reasons for according limited weight to the testimony, including the fact that all LaCrosse's character witnesses were long-term traders at CBOT who, in the Commission's estimation, "evaluated LaCrosse's conduct and character in light of CBOT's internal practices and traditions" as opposed to in light of the requirements of the Act or the Commission's regulations. *Id.* It is clear to us that the Commission did not base its decision on the absence of testimony from LaCrosse's probation officer and that it had legitimate reasons for giving limited weight to the testimony presented. The Commission did not abuse its discretion.

 LaCrosse next argues that the Commission abused its discretion by failing to consider the CBOT's proposed supervisory arrangement and by failing to consider that his livelihood depends on trading. LaCrosse's only evidence that the Commission did not consider these factors is that the Commission did not discuss them in its order. We do not require the Commission to address the transcript line-by-line in its order; it is sufficient that the Commission makes a decision based on consideration of the entire record before it. The Commission engaged in a thorough analysis of the relevant evidence following the framework it established in *LaCrosse I*, 1993 WL 316017, at *4*5. It dedicated substantial time to the issues before it; the fact that the Commission did not discuss the CBOT supervisory arrangement or that LaCrosse's livelihood depends on trading does not establish that the Commission did not consider this evidence.

In addition, the Administrative Procedure Act § 557(c)(3)(A) requires an agency to include with each order "a statement of findings and conclusions, and the reasons or basis therefor, on all the material issues of

**5.** We note that the Commission has not provided much guidance on who, other than a probation officer, qualifies as an expert in rehabilitation. The concept of a "rehabilitation expert" is novel. Predicting future crimes is a roll of the dice; there are no genuine "experts" about who is likely to commit which offenses tomorrow, or even what classes of persons pose genuine risk. Therefore it remains unclear who qualifies as a "rehabilitation expert," such that the Commission would accord his or her testimony substan-

tial weight. By failing to set forth the relevant and necessary characteristics for rehabilitation experts, the Commission gives itself free rein to discredit any manner of testimony. In the facts of the instant case, the Commission had *other* legitimate reasons to accord the witnesses' testimony limited weight, and it is on this ground that we find no abuse of discretion. However, absent these alternate reasons for discounting the testimony, the Commission's lack of guidance on this issue could rise to an abuse of discretion.

fact, law, or discretion presented on the record." 5 U.S.C. § 557(c)(3)(A). In *LaCrosse I* the Commission set forth the relevant considerations for imposition of a trading ban under § 9(b), and the Commission followed its own directive in *LaCrosse II* by considering all of the factors it had previously identified. Nowhere in *LaCrosse I* did the Commission suggest that CBOT sponsorship or consideration of livelihood was a necessary, material factor in the decision to impose a trading ban under § 9(b). While evidence of sponsorship or livelihood may be helpful in analyzing rehabilitation or the role respondent intends to play in the market, the Commission's precedent does not require its consideration. *See LaCrosse I*, 1993 WL 316017, at *4–*5. We therefore find no abuse of discretion here.

■ In LaCrosse's final abuse of discretion argument, he challenges the Commission's holding in *LaCrosse I* that a petitioner cannot petition for statutory review under § 9(b) until he has served half of his trading ban. The Commission stated:

> Once a trading prohibition has been imposed in accordance with Section 9(b), the Commission is authorized to accept petitions and, for good cause shown, reduce the period of the prohibition. As a matter of guidance, we note that, in the future, we will accept such petitions for consideration after respondent has served half the term of the trading prohibition imposed in the Commission's final order.

*LaCrosse I*, 1993 WL 316017, at *6 n. 6. LaCrosse contends that the Commission is not permitted to impose time limitations on the presentation of rehabilitation evidence, that it is not authorized by statute, and that the Commission's holding is unjust.

LaCrosse directs our attention to *Sundheimer v. CFTC*, 688 F.2d 150 (2d Cir.1982), for the proposition that "the Commission is not permitted to impose time limitations on the presentation of rehabilitation evidence." In *Sundheimer*, the Second Circuit held that the Commission could not require the passage of a minimum amount of time before hearing evidence of rehabilitation when de-

termining whether to revoke a person's registration. *See id.* at 153. By imposing such a requirement, the Second Circuit found that the Commission was actually "imposing a sentence in the guise of determining fitness for registration." *Id.* In the present case, the sentence or sanction has already been imposed. It required no "guise." The requirement that LaCrosse wait a certain period of time prior to challenging the length of the sanction therefore does not implicate the same concerns that motivated the Second Circuit's opinion. Additionally, the Second Circuit opinion addresses registration revocation, not the reinstatement of trading privileges terminated under § 9(b) of the Act.

LaCrosse also argues that the time period established by the Commission is not authorized by the statute. LaCrosse cites no authority in support of this proposition. The statute grants the Commission the authority to prescribe the "terms and conditions" of the trading ban and grants the Commission discretionary authority to determine whether and when it will consider reducing the period of the trading ban. *See* § 9(b) ("The Commission may upon petition later review such disqualification and market bar and for good cause shown reduce the period thereof.") (emphasis added). In light of the discretionary language of the statute, we do not find that the Commission abused its discretion in requiring that respondent serve half of the ban imposed by the Commission's final order prior to requesting a reduction in the length of the ban.[6]

Finally, LaCrosse claims that the Commission's requirement is particularly unjust in this case because of the amount of time that has already passed since his illegal acts. We are not persuaded by this argument for the reasons outlined in Section C below.

C. LaCrosse's Claim That Imposition of a Sanction Seven Years After Conviction Is Inequitable

■ LaCrosse appeals to this Court's inherent equitable power and claims that we should use our discretion to limit the Commission's power to impose sanctions upon

---

6. While LaCrosse states that "[i]n effect, the Commission has impermissibly engaged in administrative rulemaking," he cites no authority supporting this conclusion. We decline to craft

LaCrosse's argument for him, and therefore we do not address this unsupported contention. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir.1991).

him. He argues that his case presents special circumstances because the Commission is attempting to punish him over seven years after his conviction and eight years after his illegal conduct. While we recognize that a substantial period of time has elapsed since LaCrosse's conviction, most of this time was spent ensuring that LaCrosse received a fair hearing. The Commission, in *LaCrosse I*, remanded his case to the ALJ because the Commission felt that the ALJ did not have sufficient guidance on implementation of § 9(b) in the first proceeding. After remand, the Commission again heard LaCrosse's appeal. We now address LaCrosse's appeal from the second Commission decision. For the most part, the hearings and decisions in this matter have progressed in a timely manner. The largest time lapse occurred from May 1994, when the ALJ issued his order on remand, to January 1997, when the Commission issued its order on appeal from the ALJ's decision. We do not condone such time lags, although we recognize that sometimes the wheels of justice turn slowly. However slowly, they have continued to turn in this case.

Additionally, LaCrosse could have elected to ask the Commission to begin his trading ban earlier, for instance after the first ALJ decision. Both the CFTC and LaCrosse seem to think that the trading ban should not begin until its end date is set, but this is not a necessary conclusion. A ban could start (and thus accelerate its conclusion) even while the terminal date is under dispute. Because LaCrosse did not elect this option, however, and instead chose to oppose even a day's trading ban, we are not sympathetic to LaCrosse's complaint that the Commission is trying to impose the ban seven years after his conviction and eight years after his illegal conduct. We therefore find LaCrosse's appeals to equity unpersuasive.

We find LaCrosse's arguments based on the Double Jeopardy Clause, abuse of discretion, and equity to be unpersuasive. We therefore AFFIRM the order of the Commodity Futures Trading Commission.