Wayne I. ELLIOTT, Francis Maritote, J. Brian Schaer and Jonathan A. Sion, Petitioners,

v.

COMMODITY FUTURES TRADING COMMISSION, Respondent.

No. 98–1305.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 28, 1998

Decided Feb. 3, 2000

Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 24,995 at 37,684 (CFTC Jan. 25, 1991). Like most trade practice enforcement actions, this case involves a set of undisputed facts and the competing inferences that can be drawn from those facts. *See, e.g., In re Reddy*, [1996–1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 27,-271 at 46,210 (CFTC Feb. 4, 1998). The Commission says the circumstances here support an inference of non-competitive and pre-arranged, and therefore illegal, trading. Wayne Elliott, Francis Maritote, J. Brian Schaer and Jonathan A. Sion (the petitioners) disagree, as did an ALJ who heard the case in the first instance. The CFTC reversed the ALJ, finding against the petitioners, who now seek our review. Because the Commission is presumptively better able to weigh the relative strengths of the competing inferences and because its conclusion is reasonable, we affirm its order granting the enforcement action.

## I.

Bringing a common combination of charges,[1] the Division alleged, in essence, that the petitioners had executed 32 non-competitive, non-bona fide trades. Pursuant to 17 C.F.R. § 10.66(d), the Division's investigator, Hugh Rooney, presented his direct testimony in the form of a written report filed before the hearing. Rooney's testimony consisted of two parts. First, he described what happened. The petitioners did not contest this description, and we summarize this factual testimony immediately below. Second, Rooney offered expert opinion testimony about the inferences to be drawn from these facts. The petitioners bitterly opposed Rooney's analysis and conclusion. We discuss the issues raised by this testimony later. *See* Part III, *infra.*

Rooney provided an undisputed factual introduction to the petitioners, the futures

James R. Thompson (argued), Winston & Strawn, Chicago, IL, for Petitioners.

J. Douglas Richards (argued), Commodity Futures Trading Commission, Office of the General Counsel, Washington, DC, for Respondent.

Carol A. Burke, Board of Trade of the City of Chicago, Chicago, IL, for Amicus Curiae.

Before CUDAHY, EASTERBROOK and RIPPLE, Circuit Judges.

CUDAHY, Circuit Judge.

■ The Division of Enforcement (Division) of the Commodity Futures Trading Commission (CFTC or Commission) need present only circumstantial evidence—and only a preponderance of it—to establish liability for trade practice violations. *See, e.g., Reddy v. CFTC*, 191 F.3d 109, 118 (2d Cir.1999); *In re Buckwalter*, [1990–1992

---

1. The Division charged the respondents with (1) engaging in noncompetitive trading in violation of § 1.38(a) of the Commission Regulations; (2) engaging in wash sales in violation of §§ 4c(a)(A) and (B) of the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.*; and (3) posting non-bona fide prices in violation of § 4c(a)(B) of the Act.

market and the charged trades. He told the following story. In 1991, the petitioners were members of, and registered floor traders at, the Chicago Board of Trade (CBOT). Each was an experienced, high-volume trader in wheat futures (among other commodities) for his own account (a "local" trader). Elliott had traded wheat futures for almost 20 years. Maritote had 15 years experience. Schaer and Sion were newer to the pits, but still active, high-volume traders.

Rooney also explained that wheat contracts are delivered in March, May, July and September. Trading during these delivery months is considerably more risky than during non-delivery months. Contract delivery on the CBOT is on a "first-in-first-out" basis: those traders with the oldest contracts are at the front of the delivery line; those with newer contracts are at the back. Traders can reposition themselves in the delivery line (a practice called "freshening") by liquidating old open positions in the nearby delivery month and buying equivalent volume contracts for future delivery (called the deferred month).[2] As a trader's delivery date nears, the price differential between the contracts on the deferred month and those on the nearby month narrows. The longer a trader waits to freshen his position, the greater the potential profit. If he fails to successfully freshen, however, he risks arrival at the front of the line where he will be forced to accept delivery and pay the carrying charges for storing and insuring the grain. Because of these risks, only some of the 75 to 100 wheat futures

traders remain active during the wheat delivery months. Each of the four petitioners was a member of this relatively elite crew.

At the end of February 1991, each of the petitioners was close to the front of the delivery line for March wheat contracts. Each also held positions in May and July wheat contracts. Over eight trading days immediately prior to and during the March delivery cycle, the petitioners, trading among themselves, sold and repurchased the same spreads in identical quantities at the same price differential in a series of 32 trades.[3] None of the petitioners suffered a loss or realized a profit from these trades; their net positions did not change. Summary descriptions of the trades follow:

1. February 25. Elliott sold 1000 March–July spreads at 21 cents to Maritote. Elliott bought 1000 of the same spread at the same price—450 from Maritote and 550 from Sion. Sion got his 550 from Maritote, also at 21 cents. Schaer was not involved.

2. February 26. Elliott sold 735 March–May spreads at 10.75 cents to Maritote. Elliott bought 735 of the same spread at the same price from Sion. Maritote sold 735 of the same spread at the same price to Sion. Schaer was not involved.

3. February 27. Trading only March–May spreads at 11.5 cents, Elliott bought 1500 from Maritote, sold 2500 to Sion and then bought another 1000 from Maritote. Maritote bought 2500 of the

2. Freshening is a legitimate trading strategy. See, e.g., In re Collins, [1986–1987 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 22,982 at 31,903 n.25 (CFTC Apr. 4, 1986), rev'd on other grounds, Stoller v. CFTC, 834 F.2d 262 (2d Cir.1987); see also R. 53 at 309 (Rooney stating that "[t]he freshening of open futures positions is a legitimate means to decrease or delay the physical delivery of a cash commodity"). "Indeed, the practice of freshening a position can be viewed as a salutary one since it helps to assure that longs desiring delivery will be high on the final lists of eligible assignees of delivery notices." JOHNSON & HAZEN, COMMODITIES REGULATION § 2.05[5] at 2–58.

3. A spread is the simultaneous purchase of a commodity for delivery in one month and the corresponding sale of the same commodity for another delivery month. The price differential between the contract sold and the contract purchased is the price of the spread. A trader "buys the spread" when he purchases the nearby month and sells the deferred month; he "sells the spread" when he purchases the deferred month and sells the nearby month. See generally JOHNSON & HAZEN, COMMODITIES REGULATION § 1.03[5][B].

same spread at the same price from Sion. Schaer was not involved.

4. March 4. Elliott bought 1000 March–May spreads at 9.5 cents from Sion, then, turned around and sold them to Maritote. In two separate trades, each of 500, Maritote sold 1000 of the same spread at the same price to Schaer. Schaer sold them to Sion.

5. March 6. Elliott bought 2500 March–May spreads at 10.75 cents from Sion and sold them to Schaer. Schaer sold the same quantity of the same spread at the same price to Sion. Maritote was not involved.

6. March 7. Elliott sold 2500 March–May spreads at 10 cents to Schaer and bought the same quantity of the same spread at the same price from Sion. Sion bought 2500 from Schaer. Maritote was not involved.

7. March 8. Maritote bought 500 March–May spreads at 9.5 cents from Sion and sold them to Schaer at the same price. Elliott bought 2000 March–May spreads at 9.5 cents from Sion and sold them to Schaer. Schaer sold all 2500, in two trades, to Sion.

8. March 13. Elliott bought 1800 March–May spreads at 8.75 cents from Schaer and sold them to Sion. Sion sold 2600 of the same spread at the same price to Schaer and then bought 800 back. Maritote was not involved.

This was the Division's substantive case against the petitioners—the undisputed facts surrounding the trades. The Division presented no direct evidence that the petitioners had pre-arranged or non-competitively executed any of the trades. The evidence was entirely circumstantial.

Rooney concluded from this series of facts—the mere circumstances—that the petitioners "engaged in a trading scheme to freshen their March 1991 wheat futures positions to avoid, decrease and/or delay delivery of cash wheat. Furthermore, this was accomplished through noncompetitive trading and wash sales." R. 53, at 310. Rooney relied on seven "significant charac-teristics" of the challenged trades to support this conclusion. *Id.* at 272.

1. *Size.* Rooney opined that all but one of the charged trades were large trades (over 500,000 bushels) and that the petitioners accounted for an abnormal percentage of the total trade volume. *See id.* at 310–11.

2. *No gains or losses.* Rooney found it "very unusual" and "remarkable" that none of the petitioners made a profit or suffered a loss in any of the 32 trades over the eight days: "the lack of any profit or loss on any of the trades suggest that the trades were noncompetitive and wash sales." *Id.* at 311.

3. *No other traders involved.* Rooney thought that it was "unusual" that no other traders participated in any of the 32 trades. *Id.* at 312–14. On the February and March 4 trading days, there were between 25 and 41 traders trading March 1991 spreads. On March 6, only eight traders swapped March 1991 spreads. Thirteen got into the action on March 7, but only seven participated on March 8 and 13. *See id.* at 313. Despite the limited trading population, Rooney concluded that the "absence of any participation by other traders or public customers suggests that no other traders had any genuine opportunity to participate in any other trades. In other words, the [petitioners] deliberately excluded other market participants and therefore their trades were noncompetitive." *Id.* at 314.

4. *Trade configurations.* Rooney concluded that the circular trading pattern—between three or four of the petitioners—was indicative of non-competitive trading and constituted an effort by the petitioners to avoid any market risk. *See id.* "In general, competitive trading will rarely, if ever, result in a trade configuration with such overall precision and symmetry. It is virtually impossible for these configurations to occur in a competitive market. Competitive trading is char-

acterized by a certain randomness.... [S]ince price should be the only reason to prefer one trader over another trader, competitive trading is usually dispersed among numerous traders and brokers. The consistent repetition of the same trading partners indicates a lack of genuine price competition and prearrangement." *Id.* at 315.

5 and 6. *Audit trail irregularities.* The fifth and sixth significant factors both relate to the reporting and recording of the trades. Rooney concluded that trading irregularities and audit trail deficiencies such as out-of-sequence trades and late trading cards, although not unusual in volatile markets, suggested non-competitive trading in this case because none of the trades involved third parties (brokers or customers or dual traders) and none involved price fluctuations. *See id.* at 317–19. The petitioners also recorded the trades in unusual fashions, using single cards or consecutive lines. *See id.* at 319–20.

7. *Trader motivation.* Rooney noted a similarity of motivation: all of the trades appear to have been executed to allow the traders to freshen their positions and avoid delivery. *See id.* at 320–21. He did not think that this factor was particularly significant: "I do not believe it is essential to isolate a motivation, as I have here, in order to conclude that the trades were noncompetitive and wash sales." *Id.* at 321.

The petitioners did not contest Rooney's factual account; they admitted making the charged trades in order to freshen their positions. But they also asserted—each petitioner testified at the hearing—that all of the trades were completed competitively by open outcry in the pit and denied that any of the trades were pre-arranged. Character witnesses testified on behalf of each petitioner, vouching for his reputation for honesty. The petitioners did, however, challenge Rooney's conclusion that the circumstances gave rise to an inference of non-competitiveness or pre-arrangement strong enough to establish liability.

Before the hearing—recall that Rooney's direct testimony was presented in written form and filed in advance of the hearing—the petitioners argued that Rooney's opinion lacked foundation and was unreliable and therefore should be excluded under FED.R.EVID. 703. *See* R. 75. The ALJ, repeating the Division's response to this motion, *see* R. 77, rejected this argument on the ground that the petitioners could cross-examine Rooney about the foundation for his conclusion at the hearing and thereby test its reliability there. Thus, it denied the motion. *See* R. 79.

So, at the hearing, the attorneys for each of the petitioners took turns probing for weaknesses in the bases of Rooney's ultimate conclusion. They poked many holes in his opinion and extracted some significant concessions. Under cross-examination, Rooney acknowledged that his report was based on limited information. He admitted, for example, that he did not interview any other wheat traders to determine whether the trades had been conducted by open outcry, *see* R. 124, at 186–87, and that he had not conducted any historical analysis to determine whether lack of profit was an unusual occurrence during delivery months (despite, in his second significant characteristic, concluding that the lack of profit was unusual enough to warrant an inference of liability), *see id.* at 175. Rooney also admitted that it was impossible to know how many traders were in the wheat futures pit *attempting* to trade, as opposed to *actually* trading, during the relevant time periods (a concession which might undermine his reliance on the first, third and fourth significant characteristics). *See id.* at 97–98. More, he acknowledged that he had used the eight charged trading days as his entire sample for purposes of his analysis of delivery period trading (another admission which might negate reliance on the first four characteristics), *see id.* at 152–54, and conceded that, in his opinion, it would be impossible to quantify the likelihood of the observed audit trail irregularities (casting

doubt on his reliance on characteristics numbers five and six), *see id.* at 189. These and other Rooney concessions amounted to an admission that his conclusion was not based on a rigorous statistical analysis. In fact, it was impossible for the petitioners to cross-examine Rooney about the factual and statistical bases for many of his conclusions because the conclusions were based on computerized CBOT records which Rooney had studied online but had not reduced to hard copies and had not produced for the petitioners. *See id.* at 72–75.[4] The Division apparently managed to produce portions of some of these documents during a break in Rooney's cross-examination, *see id.* at 80–82, but the petitioners were never given all of the relevant background information.[5]

The ALJ dismissed all three charges. Relying on the petitioners' testimony as well as the testimony of two other traders, the ALJ determined that all of the trades had been conducted by open outcry and that market conditions, rather than prearrangement, had limited participation during the risky delivery cycle. He was unpersuaded by Rooney's seven significant characteristics, concluding that the trading patterns amounted to only insubstantial circumstantial evidence.

The Division appealed to the full Commission, which reversed the ALJ's dismissal of the charges. The Commission discounted the traders' testimony that the trades had been executed by open outcry and focused instead on the "precision and symmetry" of the trading configurations. It concluded that this pattern evidence belied the randomness normally associated with competitive trading and therefore granted enforcement.[6]

## II.

The petitioners frame the question on appeal as one of sufficiency of the evidence—whether the circumstantial evidence was enough to establish liability. *See* Petitioners' Br. at 16. As we noted at the start, circumstantial evidence can suffice to meet the Division's burden. *See, e.g., In re Buckwalter,* [1990–1992 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 37,684. "[H]owever, the Division must do more than present suspicious circumstances suggesting the possibility of knowing wrongdoing. It must establish that the existence of these factual elements is more probable than their nonexistence." *In re Rousso,* [1996–1998 Transfer Binder] Comm. Fut. L. Rep.(CCH) ¶ 27,133 at 45,-308 (CFTC Aug. 20, 1997) (internal quotations and citations omitted); *see also In re Abrams,* [1994–1996 Transfer Binder] Comm. Fut. L. Rep. (CCH) ¶ 26,479 at 43,136 (CFTC July 31, 1995) ("If both innocent and culpable inferences are equally supported by the record, the Division fails in its burden of proof."). Evidence of unusual trading patterns, like that presented

---

**4.** However, the Division was not required to produce any of its evidence prior to the hearing. *See Chapman v. CFTC,* 788 F.2d 408, 410 (7th Cir.1986) (" 'there is no basic constitutional right to pretrial discovery' in CFTC proceedings") (quoting *Silverman v. CFTC,* 549 F.2d 28, 33 (7th Cir.1977)).

**5.** The petitioners also offered their own expert witnesses to counter Rooney's opinion testimony. Professor Scott Irvin testified that futures markets become increasingly less liquid during delivery periods and that freshening during the delivery cycle improves liquidity. A CBOT official testified that the audit trail irregularities were not uncommon. A veteran CBOT trader testified that he remembered the charged trades being conducted by open outcry and that he did not think that the patterns

of trading indicated pre-arranged trading. The petitioners also proffered the testimony of a former CBOT investigator who would have testified that Rooney's investigation was critically flawed and that the factors relied upon by Rooney were not in fact indicative of noncompetitive trading. The ALJ, however, rejected this testimony.

**6.** *Commissioner Tull dissented.* He argued that, as a former trader himself, he was "uniquely qualified among [his] fellow Commissioners to interpret the implications and inferences of the trading activity that lie at the heart of this case." R. 175, at 27 (Commissioner Tull, dissenting). He opined that the evidence was *insufficient to give rise to an* inference of culpability. *See id.* at 27–28 (Commissioner Tull, dissenting).

here, commonly gives rise to an inference of culpability. *See, e.g., In re Reddy*, [1996–1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) at 45,308; *In re Rousso*, ¶ 27,133 at 45,308 ("a pattern marked by characteristics unlikely to occur in an open and competitive market was indicative of noncompetitive trading") (citations omitted); *In re Bear Stearns* & Co., [1990–1992 Transfer Binder] Comm. Fut. L. Rep.(CCH) ¶ 24,994 at 37,663–64 (CFTC Jan. 25, 1991).

▮ Two standards of review can apply to appeals from the Commission. If the question presented is "of the sort that courts commonly encounter, *de novo* review is proper." *Ryan v. CFTC*, 145 F.3d 910, 916 (7th Cir.1998) (citations and internal quotations omitted). On the other hand, if the Commission's decision was peculiarly within its area of expertise, we apply a deferential standard and will affirm so long as the decision is reasonable. *See Cox v. CFTC*, 138 F.3d 268, 271–72 (7th Cir.1998); *LaCrosse v. CFTC*, 137 F.3d 925, 929 (7th Cir.1998). Determining which standard to apply is no easy matter, however, because "if the question involves an interpretation within the specialized knowledge of the agency, a court should not automatically abandon heightened review." *Maloley v. R.J. O'Brien & Assoc., Inc.*, 819 F.2d 1435, 1441 (8th Cir.1987). "When the agency diet is food for the courts on a regular basis, there is little reason for judges to subordinate their own competence to administrative 'expertness.'" *Hi–Craft Clothing Co. v. NLRB*, 660 F.2d 910, 915 (3rd Cir.1981). Thus, courts have exercised plenary review over common law issues, *see, e.g., Morris v. CFTC*, 980 F.2d 1289, 1294 (9th Cir.1992) (reviewing *de novo* a waiver of "pivotal issue" in a fraudulent inducement claim), constitutional issues, *see, e.g., LaCrosse*, 137 F.3d at 929–32 (reviewing *de novo* a double jeopardy issue), and issues within an agency's special expertise but which are also a regular part of the court's jurisprudential diet, *see, e.g., Maloley*, 819 F.2d at 1440–42 (reviewing *de novo* the Commission's determination that the respondent

had failed to exercise "reasonable diligence" in discovering the fraud because the court had often considered what evidence supported a finding of "reasonable diligence"). On the other hand, courts have applied the deferential standard to Commission determinations of the evidence necessary to prove violations of various sections of the Commodity Exchange Act (the Act), *see, e.g., Monieson v. CFTC*, 996 F.2d 852, 859–61 (7th Cir.1993) (§ 13(b)); *Morris*, 980 F.2d at 1295–96 (§ 4(b)); *Silverman v. CFTC*, 549 F.2d 28, 29–33 (7th Cir.1977) (§ 4(b)), as well as Commission rules, *see, e.g., Monieson*, 996 F.2d at 861–62 (CFTC Rule 166.3).

We believe the deferential standard applies here. Deciding whether a particular set of circumstances supports an inference of non-competitive trading on the futures markets is an issue peculiarly within the Commission's area of expertise. *See Ryan*, 145 F.3d at 923 ("[N]either a criminal jury nor the Seventh Circuit, however authoritative their declarations, can claim expertise in the conduct of trading at the CBOT .... [T]he Commission [is] certainly an expert in matters relating to trading ....") (Cudahy, J., concurring). While this court often faces sufficiency issues, the particular and peculiar nuances of the issue in this situation—involving, as it does, the enforcement of CFTC trade practice rules, *see, e.g., Monieson*, 996 F.2d at 859–62—are not "food for the court on a regular basis." *Hi–Craft*, 660 F.2d at 915. We have found no published opinions in which a federal court has considered whether a particular set of futures market trading facts gives rise to an inference of pre-arrangement or non-competitive trading. The Commission, on the other hand, regularly considers the question and has already drawn a line, even if difficult to define, between evidence that establishes culpability and that which does not. *See discussion supra* at 931–32. We are not inclined to second-guess the Commission on this issue, nor do we relish redrawing the line ourselves. In short, the Commission is uniquely well positioned

to make these sorts of fact-specific, inference-laden determinations.[7]

 In this case, the Commission's decision passes muster. After noting that, "as the Commission has repeatedly found, direct evidence of noncompetitive trading is rarely available, and [that] the circumstantial analysis of trading patterns is an appropriate starting point for proving noncompetitive trading," R. 175, at 13, the Commission analyzed the common characteristics of the charged trades. The series of trades, it found, reflected "a precision and symmetry not generally found in competitively executed trades." *Id.* at 14. The interrelated trading pattern was also critical, and the Commission highlighted the fact that some of the trades were against the economic interest of the petitioners: "If a single participant in the ring-like transaction failed to play his part, none of the participants would succeed. In these circumstances, it is unlikely that a trader would repeatedly act against his own economic interest without advance knowledge that the other participants would continue trading the spread, enabling him to offset his newly-acquired long position." *Id.* at 15. In the Commission's view, an open and competitive market simply could not have "so precisely accommodate[d] the financial and timing goals of the four [participants] acting independently of each other." *Id.* at 18. Therefore, "[b]ased on the totality of circumstantial evidence in the record, it is unlikely that petitioners would have known one another's precise needs without some meeting of the minds or could have achieved this kind of trading symmetry in a volatile market by competitive execution." *Id.* at 21.

Thus, the Commission was satisfied that the trading pattern—spreads in exactly identical quantities at the same price—was more likely than not the result of pre-arrangement and non-competitive trading. It carefully considered all of the evidence,

articulating its reasons for discounting some and accepting some. In the end, the Commission determined that the Division had presented sufficient facts to give rise to an inference of culpability, and we defer to this considered, supported and reasonable decision.

## III.

The issue of Rooney's opinion testimony remains. The fight over the admissibility of this testimony did not reach this court. Despite the pre-hearing motion, the aggressive cross-examination and the competing expert testimony, the petitioners made no objection to the admission of Rooney's report at the hearing, did not argue admissibility in their post-hearing briefs and did not raise the admissibility issue with the Commission during the Division's appeal. Thus, the admissibility of Rooney's testimony does not appear to be inescapably before this court. Indeed, we doubt that the petitioners have properly preserved the issue for appeal.

Had the petitioners sustained their attack and properly challenged the ALJ's decision to admit Rooney's opinion testimony, we *might* have been inclined to agree with them. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), held that reliability is the touchstone for expert testimony based on "scientific, technical, or other specialized knowledge" (quoting FED. R.EVID. 702). In order to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable," the factfinder must act as gatekeeper. *Id.* "Proposed [scientific] testimony must [therefore] be supported by appropriate validation—i.e., 'good grounds,' based on what is known." *Id.* at 590, 113 S.Ct. 2786. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), extended this gatekeeping function to all expert testimony. The petitioners'

---

7. Commissioner Tull believes that he, as a former trader, is in the best position to judge the strength of the circumstantial evidence.

We assume, however, that all members of the Commission are uniquely qualified to make these sorts of judgments.

effective cross-examination of Rooney exposed his opinion—and therefore his ultimate conclusion—as unreliable. The Division, through Rooney, presented what was essentially a "numbers" case: the circumstances surrounding the charged trades, it alleged, were statistically improbable. But it provided no reliable statistics to support this charge (and, indeed, could not even produce for the petitioners some of the raw numbers upon which it allegedly relied). It conducted no analysis of the liquidity of the market or of the usual number of traders swapping spreads during wheat delivery cycles; no analysis of the likelihood that delivery cycle freshening trades would result in no profit for the traders; and no analysis of the likelihood of making mistakes on trading cards or other audit trail irregularities—that is, it failed to justify Rooney's assertion that the "significant characteristics" were at all significant. It was a numbers case without meaningful numbers, and, had the respondents objected to the admission of Rooney's opinion testimony, we think that *Kumho* might well have compelled the ALJ to sustain the objection.[8]

Note, however, that we say only that we *might* have been inclined to agree with a properly preserved challenge to the admission of Rooney's expert testimony. Our analysis is qualified because it is not plain that Rooney's *opinion* testimony played any role in either the ALJ's or the Commission's disposition of this matter. Recall that the ALJ was unpersuaded by the seven "significant characteristics" upon which Rooney relied, *see* R. 153, at 7–11:

> Taken as a whole, these characteristics do not prove that the challenged transactions were the result of an implied or express agreement to prearrange trades. The trade characteristics cited by the Division reflect a natural outcome of trades that can occur in a constricted

market among perceptive and intelligent large volume traders who want to secure a later delivery date.

*Id.* at 11. On the other hand, the ALJ did state that, "[o]n balance, [Rooney] provided an accurate *factual description* of the ... transactions and of the [CBOT] delivery process." *Id.* at 7 n. 9 (emphasis added). The Commission also appears to have drawn a distinction between Rooney's factual testimony and his opinion testimony. It mentioned Rooney's opinion testimony only once, *see* R. 175, at 14, and, in that singular instance, not as support for its conclusion. Instead, the Commission simply drew its own inferences from the undisputed accounts of the trades, focusing on the trading symmetries which it thought were indicative of non-competitive and pre-arranged trading. *See id.* at 12–23. The patterns, not Rooney's opinion, swayed the Commission.

■ It appears then that both factfinders[9] discounted Rooney's unreliable opinion testimony. This is an appropriate approach. *Daubert* and *Kumho* were decided in the context of admissibility, but the principle for which they stand—that all expert testimony must be reliable—should apply with equal force to the weight a factfinder accords expert testimony. *See Libas v. United States*, 193 F.3d 1361 (Fed. Cir.1999). Thus, a factfinder should employ the reliability benchmark in situations, as here, in which unreliable expert testimony somehow makes it in front of the factfinder, and assign the unreliable testimony little if any weight. Both the ALJ and the Commission appear to have complied with this principle, ignored Rooney's unreliable opinion and drawn their own inferences from the undisputed facts. We therefore decline to rule on the admission of the opinion testi-

---

8. This Court has recently criticized the CFTC for its standards for admitting and considering expert testimony on the issue of rehabilitation. *See Ryan,* 145 F.3d at 921; *Cox,* 138 F.3d at 275; *LaCrosse,* 137 F.3d at 934 n. 5.

9. The Commission is authorized by the Administrative Procedure Act to review an ALJ's findings and determinations *de novo* and make its own findings of fact. *See* 5 U.S.C. § 557(b); *see also Ryan,* 145 F.3d at 917.

mony in the first instance; if error, it appears to have been harmless.

## IV.

We recognize the seeming illogic of rejecting (to the extent we do) Rooney's inference on the one hand, *see* Part III, *supra*, while endorsing (also to the extent we do) the Commission's on the other, *see* Part II, *supra*. Both of their conclusions were, after all, based on the same set of undisputed facts. From our perspective, however, there is a cognizable difference. The condemnation of the admission of Rooney's opinion testimony would amount to an application of an evidentiary rule and recent interpretations of it. We would simply be telling a factfinder what evidence it may properly consider, something we regularly do. The Commission's decision, on the other hand, reaches us in a different posture: the question is not whether one piece of evidence is sufficiently reliable to be considered in the first place, but rather whether a certain quantum of specialized evidence was sufficient to raise a strong enough inference to establish liability for a violation of various provisions and rules, the enforcement of which was entrusted by Congress to a specialized agency. For precisely this reason, as we have already said, we choose not to second-guess the Commission's inferential conclusion. So, while we might prefer to see a more statistically rigorous investigation of this issue, the Commission's analysis of the circumstantial evidence was adequate.

## V.

If our dissenting colleague were a member of the CFTC, his opinion, offered as the opinion of the agency, might well survive judicial review as reasonable and as supported by substantial evidence. The issue before us, however, is not whether the CFTC here might have applied a different analysis and reached a different result; the issue is whether the analysis the agency did apply and the result it did reach have a rational basis and are supported by substantial evidence. 5 U.S.C.

§ 706. Wisdom strongly counsels and the Administrative Procedure Act demands appropriate deference to the Commission, an independent regulatory agency charged with the difficult task, among others, of detecting pre-arranged trading on its regulated exchanges. Direct evidence of pre-arrangement is rarely available and regulatory authorities are forced either to rely on circumstantial evidence or to abandon their statutory responsibilities. *See, e.g.,* *Reddy v. CFTC*, 191 F.3d at 118. The effect of requiring the elaborate sort of critique proposed by the dissent is, as a practical matter, to abandon any effort to detect pre-arrangement.

We defer to the Commission in part because of its "expertise" or perhaps more precisely, as the dissent would have it, its specialized knowledge. The expertise or specialized knowledge of the agency is institutional, not personal. The dissent is off-base in exploring the occupational backgrounds of members of the Commission. As the dissent illustrates, it is a tempting but ultimately unrewarding exercise to make this a contest between the expertise of the commissioners and the expertise of the judges. The agency employs experts in the various subjects with which it must grapple and some of its staff advise the commissioners. Courts, on the other hand, employ no experts to advise the judges although it has been suggested from time to time that judges too should have expert advisors. But in the interest of fairness, courts generally eschew the idea of kept experts whispering in the judges' ears. And to try to run agencies like courts is what Alfred Kahn deplores as the "over judicialization" of the regulatory process. 2 ALFRED E: KAHN, THE ECONOMICS OF REGULATION 87 (1971) (quoting Harry M. Trebing, *A Critique of the Planning Function in Regulation*, PUB. UTIL. FORTNIGHTLY (March 16, 1967)).

This distinction between agencies and courts is one reason we reject our colleague's suggestion that we follow antitrust precedent in this case. The dissent

argues that the petitioners' trading patterns suggest "oligopolistic interdependence," a dynamic often found in antitrust cases in which "repeat interactions lead small numbers of players to act *as if* they had agreed...." Dissent at 944. This court has refused to punish oligopolistic interdependence without some evidence of agreement, and the dissent urges us to follow suit here. *See JTC Petroleum Co. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775 (7th Cir.1999).

■ But the courts are responsible, in treble damage actions and otherwise, to resolve private and public antitrust disputes in the larger economy; the CFTC has a different task. It must detect pre-arrangement in a much smaller and more intimate sphere. These are, in some respects, similar responsibilities, but that does not mean that the doctrines that bind the courts in antitrust matters can be transposed unmodified to guide the regulation of commodity exchanges. At least on the surface, relations among traders on the exchange floor are quite different than relations among large business corporations selling in the same market. Traders rub elbows constantly and may have lunch together often. Theirs is the intimacy of the poker game as opposed to the remoteness of rival armies in the field. It does not strike us that, on the question whether parallel action shows agreement, the doctrine of the courts in antitrust cases should bind the surveillance activities of the Commission. We think that the Commission is free to draw its own conclusions, as long as they are reasonable under all the circumstances. And it is free, the dissent's policy criticisms notwithstanding, to punish even pre-arrangement that hurts no customers. *See* Dissent at 942–43. That is a policy choice, and we don't think it is any of our business.

In addition to setting policy within specialized mandates, agencies must decide what resources they can afford to commit to one or another of the many determinations they have to make and must take some things as a given. This is one reason we are not moved, beyond the concerns noted earlier, by our colleague's complaints about evidentiary weaknesses in this case. For instance, the dissent complains that the record contains no evidence of "usual" trading patterns during the delivery months, without which the Commission could not conclude that the trades in question here were unusual. Our colleague apparently requires as a remedy "statistical analysis" or "empirical inquiry." Dissent at 942. But this is putting a burden on the Commission that exceeds what is routinely accepted in other areas of decision making. Witnesses are often (perhaps even usually) allowed to testify in comparative terms without establishing a baseline. As an oversimplified example, a police officer can testify that he was suspicious of a driver because he thought it unusual that a car was driving slowly and not using turn signals. The officer would be allowed to draw inferences from these facts without presenting evidence that cars usually drive faster on that particular street (much less evidence of the normal speed at which they drive). The factfinder could rely on its own experience to conclude that this sort of behavior was out of the ordinary. In the case before us, of course, the facts are more specialized, and so is the factfinder. We only ask whether the decision was non-arbitrary. Based on other like decisions, we conclude that it was.

In any event, the record is not wholly silent on the trading baseline for these delivery months. The CFTC did attempt a comparative analysis. The Commission reviewed petitioner Schaer's freshening activities on a day when he was *not* charged with unlawful trading in order to glean characteristics of "normal" trading. The agency noted that Schaer had freshened about a million bushels of wheat through ten "round-turn trades" opposite ten other traders over several of the 15–minute time brackets into which the CBOT divides the trading day (ALJ Dec. at 9 n.13), all at slightly different prices. R. 175, at 7. Against this backdrop, the agency then

reviewed petitioner Elliott's charged trades on the same day, during which he freshened 2.5 million bushels. Elliott sold the entire 2.5 million bushels to a co-petitioner, who sold the entire amount to a second co-petitioner, who then re-sold the amount to Elliott in two trades. *Id.* at 7. These transactions took place over three consecutive trade brackets—45 minutes—with *no profit or loss for any participating trader. Id.* The Commission concluded that the first incident of "innocent" freshening "differed markedly from the characteristics of the challenged trading." *Id.* at 7, 14. So the Commission *has* invoked a baseline quite understandable even to inexpert judges. Our point is not that this baseline is an exemplar, but that the CFTC did not totally neglect a contextual analysis of the market as the dissent suggests.

 Similarly, the Commission properly relied on the irregular audit trail to support a finding of pre-arrangement. The dissent says irregular trading cards prove nothing because traders frequently alter them to correct mistakes made during "fast-breaking events." Dissent at 941. But the Commission did not draw the inference of pre-arrangement from the correction of mistakes made in the hurlyburly of trading, as the dissent suggests. Instead, the Commission was swayed because the traders recorded many of the purportedly random transactions on consecutive lines of the same card, which is consistent with the inference that the trades were pre-arranged. R. 175, at 6.

In the same vein, the dissent derides the Commission's reliance on steady price action during the delivery months as evidence of pre-arrangement. Our dissenting colleague is, of course, loyal to the efficient market hypothesis, and insists that the non-volatility of prices can mean only an absence of new information about supply and demand. But if prices are set by pre-arrangement, would the efficient market hypothesis apply? And, in any event, is that hypothesis holy writ binding on the CFTC in these circumstances? *Cf. Ten-*

*nessee Gas Pipeline Co. v. FERC,* 926 F.2d 1206 (D.C.Cir.1991) (Williams, J.) "If the [Federal Energy Regulatory] Commission proposes to reject ... the Efficient Market Hypothesis ..., we ... assume that it is free to do so." *Id.* at 1211.

One additional point on the sufficiency of the evidence. The Commission was particularly impressed that the opening trades on most of the charged days were against the economic self-interest of the trader— he bought the spread when, to freshen, he would have wanted to sell. And the other traders passed up the opportunity to turn a quick profit at the opening trader's expense. The dissent says this seemingly irrational behavior can easily be explained by modern game theory. *See* Dissent at 943–44. The traders were "repeat players," who predictably forfeited a one-time profit in order to remain viable players in the pit. The logic of this argument is fine, but it fails for a number of reasons. First, it was not argued on appeal and would therefore be an improper basis on which to reverse the Commission. Second, the Commodity Exchange Act did not enact Dean Douglas Baird's *Game Theory and the Law. See Lochner v. New York,* 198 U.S. 45, 75, 25 S.Ct. 539, 49 L.Ed. 937 (1905). (Holmes, J., dissenting). Third, if the traders' strategic considerations were so obvious, we might be safe in believing that the Commission considered and rejected this explanation. Fourth, none of the traders (or other witnesses) testified that they passed up a quick profit in order to stay in good graces in the wheat pit. This last point is quite salient since, if offered, direct evidence of trading strategy would seem more probative than probabilities ascribed to game theory.

Our dissenting colleague also wonders how the CFTC could overturn the ALJ's credibility determination without a good reason. *See* Dissent at 940–41. But there was a good reason. The ALJ identified two crucial factors purportedly supporting his finding of no pre-arrangement: first, the traders said they acted on publicly

available information, and, second, they said that they had no choice but to trade among themselves because no one else was interested in participating. The CFTC found that the evidence contradicted both of these factors. The publications on which the traders supposedly relied, the "CBOT Deliveries Last Trade Date Assigned Reports" and the "Issue and Stop Listing," were "unavailable on at least some of the trading days at issue and on other relevant days contained only partial data." R. 175, at 10. And on some of the charged days early in the delivery cycle, a substantial number of traders did participate. The CFTC explained its decision to disregard the ALJ as follows: "[w]here as here, the ALJ's credibility findings are strongly contradicted by other compelling evidence, and the issue to be decided involves derivative inferences rather than testimonial inferences, the Commission will review de novo the inferences to be drawn from the record. *See N.L.R.B. v. Stor-Rite Metal Products, Inc.*, 856 F.2d 957, 964 (7th Cir.1988)." R. 175, at 21.

The dissent takes the CFTC to task for ignoring *Stoller*, and chastises us for creating a conflict with it. This is puzzling, particularly because that case is not even cited in the petitioners' main brief. Be that as it may, in *Stoller*, the CFTC, *without any evidentiary hearing* sanctioned a trader for making "wash sales" with intent to avoid a bona fide market transaction. 834 F.2d at 264. The Second Circuit held that, since the facts had never been found, the trader was entitled to a hearing to establish that he did not collude with others to *wholly avoid* market risk. *See id.* at 265. The court further held that without notice to the public through rulemaking, the Commission could not sanction as "wash sales" freshening operations that sought to minimize market risk but were not pre-arranged to wholly negate it. *See id.* at 267. The Second Circuit explained that the historical definition of "wash sales" concerned "transactions that were virtually risk-free, often prearranged, and intentionally designed to mislead." *Id.* at 266. In the present case, the Commission

is sanctioning these traders after finding as a fact after hearing that their conduct fits this historical definition; there therefore is no need for notice to the public or a new rule proclaiming a broader concept of "wash sales." The issue here, unlike *Stoller*, is whether substantial evidence supports the Commission's findings. There is no conflict with *Stoller*.

Finally, our colleague accuses us of a *Chenery* violation in "filling gaps" not addressed by the Commission. *See* Dissent at 944, citing *SEC v. Chenery Corp.*, 318 U.S. 80, 88, 63 S.Ct. 454, 87 L.Ed. 626 (1943). Admittedly, the CFTC did not digress into such matters as game theory, antitrust dynamics or *Stoller*. Nor did we address or analyze these factors in earlier sections of this opinion. The present section merely responds to the arguments of the dissent. Since the dissent does not necessarily adhere to the main lines of the Commission opinion, this responsive section by way of rebuttal must dwell on some matters not found in the Commission opinion. Therefore, the decision of the Commission is

AFFIRMED.

EASTERBROOK, Circuit Judge, dissenting.

Four floor traders at the Chicago Board of Trade executed "freshening" trades in the March 1991 wheat contract. By selling contracts back and forth, these traders moved to the back of the delivery queue. Freshening adds liquidity to the market near contract expiration, when it is much needed, and enables traders to stay in the market longer, which assists hedgers who want to retain opposite positions. The CFTC insists that all trades be done by open outcry on the floor, without prearrangement. 17 C.F.R. § 1.38(a). Believing that a round-robin of trades among four traders at a uniform price could occur only by prior arrangement, the CFTC charged them with unlawful trading practices. (The charges include wash sales, in violation of

7 U.S.C. § 6c(a)(A), and sales not at bona fide prices, in violation of § 6c(a)(B), but these charges depend on the proposition that the trades were non-competitive. I therefore focus on prearrangement.) The contrary view is that the four traders dealt among themselves because they were the only ones willing to take the risk at the end of the contract, that the prices were uniform because no new information about the demand or supply of wheat arrived at the market during the brief periods needed to accomplish the freshening, and that the events are best explained as an example of what in antitrust law would be called oligopolistic interdependence—a situation that does not support a finding of agreement. See *JTC Petroleum Corp. v. Piasa Motor Fuels, Inc.*, 190 F.3d 775, 780 (7th Cir.1999).

Thirteen years ago the CFTC concluded that symmetrical freshening trades at a uniform price are enough by themselves to violate federal law. *In re Collins*, Comm. Fut. L. Rep. ¶ 22,982 (Apr. 4, 1986), ¶ 23,401 (Nov. 26, 1986). But in *Stoller v. CFTC*, 834 F.2d 262 (2d Cir.1987), the second circuit disapproved this conclusion and held that, unless the CFTC has adopted a rule defining what practices are forbidden, it must conduct a detailed factual inquiry into the genesis of the trades. After *Stoller* the agency did not adopt such a rule. Although in our case it held a hearing, in the end the Commission found, exactly as in *Stoller*, that symmetrical freshening trades violate the Act. Today my colleagues approve this conclusion and create a conflict with *Stoller*. For its part, the CFTC relied heavily on the *Collins* opinions that the second circuit declined to enforce, adding only the puzzling *"rev'd on other grounds, Stoller v. CFTC*, 834 F.2d 262 (2d Cir.1987)." In re Elliott,* 1998 CFTC LEXIS 25 at *20, Comm. Fut. L. Rep. ¶ 27,-243 (Feb. 3, 1998). What "other grounds"? That is the last we hear of *Stoller* from the Commission—which is to say that, like my colleagues, the CFTC did not attempt to reconcile its position with the only judicial authority on the subject. (The penultimate paragraph of the majority's opinion says that *Stoller* is about wash sales, while

this case is about prearrangement. That's your classic distinction without a difference. Trades come to be *called* "wash sales" because of prearrangement. The traders' actual conduct in *Stoller* and this case appear to be identical. The CFTC demonstrated as much by relying heavily on *Collins*, the very opinion reversed by *Stoller*. Prearrangement was the central issue in both cases, and my colleagues do not offer any reason to believe that the second circuit would enforce the administrative order, for at the end of the day the CFTC disregarded the evidence collected in the hearing and rested on its *a priori* view about freshening at a uniform price, exactly as in *Stoller*.)

What evidence does this record contain? In addition to the trades themselves, there are three kinds. First is testimony by the four traders, each of whom denied prearrangement. The ALJ believed this testimony, and the CFTC gave no reason for disbelieving it other than its view (the very position rejected in *Stoller*) that round-robin trades by themselves demonstrate prearrangement. Second there was testimony by other traders that the questioned transactions were handled by open outcry in the pit, and that other traders could have participated had they wanted to do so (and been willing to take the risk—much more substantial for other traders with small positions in the contract than for the four who sought only to freshen large positions they already held). This testimony by disinterested observers, if believed—and the ALJ did believe it—is incompatible with prearrangement and demonstrates as well that the supposed dangers of prearrangement were missing. (More on this below.) The CFTC did not give a reason for disbelieving this testimony. The third stripe of evidence was supplied by Hugh Rooney, an investigator for the Division of Enforcement, who testified that the trading pattern was so unusual that only prearrangement could explain its details. My colleagues conclude that Rooney's testimony is junk science of no probative value, and I agree. With Rooney's

views disregarded, the only differences between this record and the record in *Stoller* favor the traders. Yet my colleagues enforce the CFTC's order. They say that the Commission's "expert" view is entitled to deference. Unless we are to abandon all judicial review of administrative orders, however, we cannot kowtow to a *claim* of expertise; the claim must be supported by evidence and reasoning.

Ever since Congress began to establish independent agencies in 1887, it has been customary to refer to a commission's "expertise." This is a figure of speech, an honorific, rather than a description of commissioners' backgrounds and skills. It would be more accurate to call commissioners of the CFTC (and other agencies) "specialists." None of the Commission's current members is trained in statistical analysis or game theory, which might assist in understanding the dynamics of interactions among a few traders at the end of a contract. None is an expert in industrial organization, which could contribute to understanding oligopolistic interdependence. None is a financial economist. Only one of the four Commissioners who participated in the order under review had any experience in the trading pits, and he dissented from the decision under consideration. (Before joining the CFTC, the three members of the majority were a lawyer, a banker, and a manager of an agricultural conservation program.)

Courts accept agencies' decisions to the extent that Congress has delegated authority to them, not because their decisions may be supported by unspoken reasoning that is too sophisticated to be explained to mere judges. Delegation entails the power to make policy choices. See *FCC v. National Citizens Committee for Broadcasting*, 436 U.S. 775, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978); *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). What the CFTC has done here does not amount to a reasoned policy choice, however. Challenged by *Stoller* to draw up a rule (or even announce a policy) governing fresh-

ening, the Commission kept silent. Instead we have for review a finding of fact that the four traders prearranged their activities. Under the Administrative Procedure Act, the question now is whether that finding is supported by substantial evidence. 5 U.S.C. § 706(2)(E). What evidence might that be, given that *all* of the testimony other than Rooney's favored the traders, and Rooney's is worthless?

The usual way to prove agreement is co-conspirator testimony and physical evidence consistent with private deals off the trading floor. Yet everyone in a position to know the truth testified that there had been no private arrangement. The ALJ believed this testimony. I recognize that an agency can disagree with an ALJ's credibility determination, see *Stanley v. Board of Governors*, 940 F.2d 267 (7th Cir.1991), but it needs a good reason. *Morris v. CFTC*, 980 F.2d 1289 (7th Cir.1992). The usual grounds for upsetting a credibility decision, such as internal contradictions in the testimony and incompatibility between oral and documentary evidence, are missing. The CFTC's only apparent rationale for disbelieving the traders is that their testimony clashes with its *a priori* belief that symmetrical trades must have been prearranged. That circular approach is some distance from substantial evidence. Perhaps the CFTC had a more acceptable reason, but it did not give one. (The principal reason advanced in the CFTC's appellate brief—that the ALJ did not make a credibility decision at all, because he applied the word "truthful" rather than the word "credible" to the traders' testimony—is ludicrous.) Because an ALJ's decision to believe testimony is entitled to weight in the substantial-evidence calculus even if the agency disagrees, see *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496–97, 71 S.Ct. 456, 95 L.Ed. 456 (1950), the CFTC's lack of a good reason for its disbelief of the traders leaves the ALJ's findings intact.

Physical evidence is another ordinary way to show agreement. Yet there are no phone records or writings consistent with prior arrangement. One standard form of evidence—so basic that in other cases the CFTC has insisted on it—is evading open outcry on the trading floor. If traders perpetrate hugger-mugger to avoid scrutiny by their peers, and thus to prevent competitive bids from being made, then it is sound to infer that the fix is in and that the "real" price and quantity were set off the floor. In this case, though, it is undisputed that any other trader who wanted to participate could have done so. Stan Komparda and Robert Williams, both veterans of the pits, testified that the trades were made by open outcry and that they could have participated. Three additional traders, William Allen, John Warner, and Daniel Henning, testified that the pattern of round-robin trading in which petitioners engaged was common in the closing month of a contract. My colleagues' footnote 5, which refers to "a" veteran trader, understates the force of this testimony. But the CFTC itself simply ignored it.

Well, if all the testimony other than Rooney's contradicts the CFTC's position, and if Rooney lacked a foundation for his conclusions, how could the CFTC reach the conclusion it did? It gave two hints.

One is that audit trail irregularities occurred. So much is undisputed, but what makes the irregularities (a word the CFTC applies to all errors; it does not connote intentional wrongdoing) the basis for an inference that the trades were prearranged? Trading cards frequently are altered, because traders write things down wrong when fast-breaking events distract their attention. The question is not whether errors occurred in the documentation of the trade, but whether these were *unusual*, and, if so, whether the nature of the departure from the norm implies that misconduct was afoot. The CFTC was silent on both of these questions. It did not find (or point to anything in the record that could support a finding) that the irregularities here were abnormal. If the number and kind of irregularities were normal for

this type of trading, then there is no basis for an inference that hanky-panky occurred. As for the second question— whether these errors imply prearrangement—the Commission did not explain its thinking. An outsider may be excused for believing that the Commission got it backward. If the four traders prearranged their dealings, then why aren't the audit trails flawless? It is letter-perfect trading cards, not normal errors, that would point to an existing deal. (Similarly, in antitrust law, it was the rotation of bids by the phases of the moon that signaled the conspiracy among electrical equipment manufacturers. The random noise of a competitive market would have stamped out any such pattern.)

Perhaps the CFTC had some reason for thinking that errors, rather than perfection, show prearrangement—but what matters now is that the Commission did not give a reason. Courts do not think that an expert's bare conclusion is the end of the inquiry. See, e.g., *Huey v. United Parcel Service, Inc.*, 165 F.3d 1084, 1087 (7th Cir.1999) ("An expert who supplies nothing but a bottom line supplies nothing of value to the judicial process", quoting from *Mid–State Fertilizer Co. v. Exchange National Bank*, 877 F.2d 1333, 1339 (7th Cir.1989), and citing many other cases); *McMahon v. Bunn–O–Matic Corp.*, 150 F.3d 651, 657–58 (7th Cir.1998); *Vollmert v. Wisconsin Department of Transportation*, 197 F.3d 293, 298–99 (7th Cir.1999). All we have on the audit-trail irregularity, however, is a bottom line; all of the reasoning, and all of the intermediate facts (such as whether this audit trail was unusual) have been omitted.

The other non-testimonial approach, and the one on which my colleagues principally rely, is the Commission's belief that the trading reflected "a precision and symmetry not generally found in competitively executed trades." (CFTC Order at 14, quoted by the majority 202 F.3d at 933 and elsewhere.) That is a proposition of fact. Were these trades unusually symmetrical?

Do competitive markets generate symmetrical trades, and if so what portion of trades have these characteristics? The record is silent on these issues. Rooney asserted that something unusual had happened, not as a statement of historical fact (he did not bother to analyze how trades occur when markets are operating normally) but as a preconception that cross-examination showed to be unfounded. Thus the cornerstone of the CFTC's decision is bereft of evidence. (That petitioners' trading sequences were not identical *to each other*, something my colleagues emphasize, *id.* at 936–37, is beside the point. No rule of law says that the first round of freshening on a given day sets a baseline to which all other rounds must conform. We need to know how a given pattern relates to the market. Some differences are predictable; to repeat a point already made, the mark of prearrangement would be identical sequences, not the normal differences that characterize competitive markets.)

Suppose this issue had been analyzed by a student of markets skilled in statistical methods. Such a person would have gathered information about trading patterns and inquired whether the pattern in this month was unusual. Then the expert would have asked whether the nature of this departure from the norm could best be attributed to prearranged trades or to some other matter—such as the fact that only four traders were active, so they were necessarily dealing only with each other. This happens all the time in discrimination cases. An expert asks not only how many members of a minority group the employer hired, but also whether this number was expected (which depends on the applicant pool) and, if not, whether it was *so* unusual that an inference may be drawn that race or sex is an explanatory variable. Courts insist that these experts perform careful work and use statistically valid methods. See, e.g., *Hazelwood School District v. United States*, 433 U.S. 299, 308–09 n. 14, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977); *Hill v. Ross*, 183 F.3d 586, 591–92 (7th Cir. 1999); *Mister v. Illinois Central Gulf R.R.*, 832 F.2d 1427 (7th Cir.1987).

No statistical analysis appears. in the CFTC's opinion, however, and a raw bottom line can't be "substantial evidence." Our recent opinion in *Chicago Board of Trade v. SEC*, 187 F.3d 713 (7th Cir.1999), and the D.C. Circuit's thoughtful opinion in *Bechtel v. FCC*, 10 F.3d 875 (D.C.Cir. 1993), stress that an agency must act like an expert if it wants the judiciary to treat it as one. In both *Chicago Board of Trade* and *Bechtel* the court set aside an agency's order when it failed to undertake the sort of empirical inquiry necessary to support the factual propositions essential to its decision. Just so here.

The Commission's opinion is problematic on additional grounds. Let me start with the rationale for banning prearranged trades, leading into the question whether this episode fits the rationale.

Wash sales are said to be bad for two reasons: first, they can give the illusion of price movements, which draws victims into the market (and also undermines the value of price signals); second, they can be used to reallocate profit from one trader to another. *Reddy v. CFTC*, 191 F.3d 109, 115 (2d Cir.1999); Philip McBride Johnson & Thomas Lee Hazen, I *Commodities Regulation* § 2.05[5] at p. 2–58 (3d ed. 1999). The classic story is one in which schemers trade back and forth with each other at inflated prices. These trades are safe for the schemers because the transactions offset one another (neither party gains or loses a cent) but dangerous to persons not aware of the sham. Outsiders take the higher price as a real one and may buy at the inflated price. When the wash sales stop, the price returns to its original level and the victims lose. The schemers, who have sold securities or contracts to the victims, make off like bandits. See Daniel R. Fischel & David J. Ross, *Should the Law Prohibit "Manipulation" in Financial Markets?*, 105 Harv. L. Rev. 503 (1991). In our situation, by contrast, prices were stable during the round-robin trading, and no outsiders were gulled. Oddly, the CFTC seems to think that the

*lack* of price movement shows that something is amiss, but this implies instead that the Commission does not understand how prices are set in competitive markets. In commodities futures markets, prices move only in response to information about supply and demand for the physical commodity. The four traders were changing places in the delivery queue; such trades by definition produce no new information about supply of or demand for wheat and therefore should not affect price. Only *prearrangement* could have produced price movements without information significant to consumers. The lack of price movement is therefore a mark in the traders' favor.

The second concern about prearranged trades is reallocation of profits. Suppose the March–July spread is 21¢ per bushel, but the traders have received information about grain supplies leading them to believe that the spread will increase, say to 25¢. Orders are supposed to be executed in sequence, and whichever customer is first in line should make a substantial profit. If the traders can engage in a private deal, however, one may transact with another at a 21¢ spread for this customer's account (depriving the customer of the profit) and the buyer will resell the contract at a 25¢ spread, obtaining the profit for himself (and presumably sharing some with the cooperating floor trader). Out-of-sequence execution and other non-competitive strategies can be a serious problem when, as in this example, it allows traders to enrich themselves at customers' expense.

But in our case it is agreed that no such thing happened—and not just because *all* of the witnesses said that the transactions were done by open outcry, so that any departure from the market price would have induced other traders to leap in. The reason no customer was hurt, or even at risk, is that there was no customer, period. The four traders were trading for their personal accounts.

Neither of the two reasons why the CFTC believes that prearranged trades can be bad for futures markets is present. Many trades arranged off the trading floor pose no risk of deceit. Stock markets, which used to follow a rule against prearranged trades, have for years allowed deals to be reached off the floor and executed on it; many trades are now handled completely off-exchange. By most accounts the change improved the efficiency of stock markets. Whether the contrary position that the CFTC imposes on futures markets is sensible is not, however, a question presented for our consideration. Nonetheless, important interests are at stake. These are the interests served by freshening trades. Following the unanimous view of commentators, my colleagues allow that freshening serves a useful purpose. 202 F.3d at 928 & n. 2. Permitting the practice encourages more traders to stay active later, which improves liquidity for the whole market. Having the ability to freshen near expiration (and thus avoid delivery) makes futures markets more attractive to speculators, who are essential to efficiency because speculators accept the risk that hedging traders want to divest. See Merton H. Miller, *Financial Innovations & Market Volatility* 200 (1991). Well, if this is so and freshening serves multiple good purposes, and if there is *no* interest on the other side of the ledger, then the outcome of this case can do nothing but impose needless costs on all participants in futures markets. That was what led *Stoller* to set aside the Commission's order: the second circuit thought that by penalizing round-robin trades as if they had been prearranged, all the Commission would do was inflict a random penalty on freshening. That proposition is still true. The CFTC thought the symmetry of the transactions proof of arrangement. But most if not all freshening trades will be symmetrical, if the traders do their jobs right. To complain about symmetry is to complain about freshening in the closing weeks of a contract (when few traders remain)—which is contrary to the premise that freshening is lawful.

One final comment about the CFTC's reasoning. The Commission thought it significant that the traders were interdependent—which is to say that they held large open positions and thus could accommodate one another. The Commission remarked in passing (and my colleagues' opinion repeats, also in passing) that something was suspicious because in the initial trade one trader suffered a loss. One trader always initiated by buying the spread, even though all four wanted (in the end) to sell the spread in order to freshen. The traders say that this is normal, that once they see that a round of freshening is in prospect they are willing to buy first because they understand that when the cycle is completed all books will balance. Suspicion then arises: why didn't the trader who got the gain in the first deal break the circle and keep the gain, leaving the others holding the bag? The answer is: "fool me once, shame on you; fool me twice, shame on me." The trader who breaks the cycle will be shunned and excluded from freshening in future months, much to his loss.

You don't need to be an expert in game theory to see this point, but it can't hurt that formal analysis demonstrates that the prospect of repeat dealing induces people to adopt cooperative behavior without agreement. The prospect of future interactions, and not explicit deals, is what keeps games of mutual interdependence going. See Douglas G. Baird, Robert H. Gertner & Randal C. Picker, *Game Theory and the Law* 159–87 (1994). Does the CFTC really think that it has falsified central conclusions of modern game theory? No, it doesn't. It has simply ignored the subject.

What to do about the way in which repeat interactions lead small numbers of players to act *as if* they had agreed is a question that comes up in many parts of the law. Think of oligopolistic interdependence in antitrust. A market has three large firms, with equal shares. None of the three leads the way in cutting prices, even though each knows that it could improve profits in the short run by cutting

price and making extra sales before the other two react. But it doesn't, because it knows that the long-run equilibrium would be equal shares at lower prices for all three firms.

By the logic of the CFTC's position, we should (perhaps must) infer that the firm's failure to maximize its short-run profits demonstrates *agreement* with the other two firms; and of course an agreement is a cartel, illegal per se under the Sherman Act. Antitrust has the same formal structure as the commodities laws. An outcome produced by agreement is illegal; the identical outcome produced by the game-theoretic effects of repeat dealing is lawful. Do we then use the observed behavior—consistent with both agreement and interdependence—to *infer* agreement and forbid the conduct? The answer in antitrust law has been "no," as we explained in *JTC Petroleum*. Perhaps the CFTC has a good reason why the answer to the oligopolistic interdependence question in antitrust is wrong, or why it does not apply to commodities trading. My colleagues surmise that economic differences between futures markets and physicals markets justify a legal difference. 202 F.3d at 936. Perhaps so; perhaps not. Yet the Commission did not confront this question. Courts are limited to the justifications the agency itself gives. *SEC v. Chenery Corp.*, 318 U.S. 80, 88, 63 S.Ct. 454, 87 L.Ed. 626, (1943). The CFTC simply *assumed* that if given conduct would be unusual unless either (a) agreement had been reached, or (b) small numbers produce interdependence, then explanation (a) must be the right one even in a small-numbers case. It did not attempt to grapple with traders' interdependence, the parallel to antitrust law, the holding of *Stoller*, or any related issue, and *Chenery* forbids us to fill those gaps.

Still, it is conceivable that the traders prearranged their freshening. Statistical analysis might show that the pattern of trades early in 1991 *was* abnormal (as the CFTC asserted). Or consider the interdependence issue. One of the four traders

began each round by buying the spread, greatly increasing his risk (unless the others cooperated by buying back), although each needed to sell the spread and then buy later. They say that they understood what had to happen, so there was no real risk. Well, that's testable. Take a month in which the CFTC does *not* suspect agreement and see whether some traders who end up freshening a position enter with buy orders. Or take such a month and determine what portion of freshening trades are symmetrical or confined to small groups. The CFTC treated trades without profit as proof of agreement; but maybe all it shows is that in a world with a lot of trades, some days will look like this even though most don't. (Similarly, if you flip a fair coin, it is even money that you'll get 10 heads in a row before 1,000 flips are done.) If this pattern happens one closing month in 100, then all the CFTC has proven here is that if you wait long enough you'll find this pattern—but without finding any agreement. But if in months that the CFTC deems normal no big trader ever leads by buying the spread, then the order in this case would be sustainable. A remand thus could be justified, but enforcement of this order cannot be.